IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


**MICHELLE Y. BROWN**, pro se,       )
                                       )
            Plaintiff,         )
                                       )
            v.             )     Case No. 11 C 5963
                                       )
**HEALTH CARE SERVICE CORPORATION**  )
and **RAYMOND E. BISANZ**, individually,  )
Vice-President Enterprise Resource Management -- )
Health Care Service Corporation,       )
                                       )
            Defendants.     )


## MEMORANDUM OPINION AND ORDER

As this Court said at the outset of its May 6, 2014 memorandum opinion and order

("Opinion") dismissing this action on summary judgment, Michelle Brown ("Brown") is

"an African-American woman still employed in a responsible executive position with Health

Care Service Corporation ("Health Care") after a successful 28-year career marked by four

substantial promotions fostered by Raymond Bisanz ("Bisanz," a higher-ranking Health Care

executive who supervised Brown during the 16-year period ending in 2008)." Indeed, given

Brown's compensation level (which in this Court's recollection is in the low six figures) it would

seem that she would have had no problem in retaining a professional knight[1] -- a well-qualified

lawyer -- to enter the lists to do combat on her behalf in the complex area of employment

_____

[1] Lest Brown view this figure of speech as an indicium of male chauvinism (a possibility that cannot be ignored, given Brown's consistently demonstrated "all looks yellow to the jaundic'd eye" perspective), she is assured that the text's comment applies with equal force to her failure to retain a woman lawyer rather than a male (in England "Dame" is now the female rank equivalent to the male "knight" -- but the "lists" are of course only figurative).

discrimination law, but she has chosen to go it alone: to act pro se. Whether than decision stems from an overweening (and mistaken) sense of her own capabilities or from some other factor is unknown, but the end result has been that the only bias that has been revealed by either side's evidence and other submissions is Brown's self-bias.

It is really not possible to convey adequately to any reader of the record in this case -- to someone who has not had to experience them first-hand -- the intransigence and misperceptions that Brown has brought to this litigation. Perhaps the closest that this Court can come to replicate that experience for others is (1) to attach (as Ex. 1) a copy of its brief dispositive Opinion and its lengthy attachment -- an opinion that was unique for this Court in its having adopted, for the first time in its judicial tenure spanning more than three decades, a litigant's presentation that nailed the issues and their resolution so completely -- and (2) to attach (as Ex. 2) a copy of this Court's even more brief June 4 memorandum order, which was even more brief because it served to deny Brown's "Motion To Amend Judgment" out of hand, labeling that motion "really a turgid rehash of her prolix and unsuccessful opposition to that summary judgment motion."

Because Brown has taken an appeal from the dismissal of her action, all that remains on this Court's plate for decision are Health Care's bill of costs and its motion seeking supplemental sanctions for Brown's having filed her legally frivolous Motion To Amend Judgment. Those subjects have been briefed by both sides, and it turns out that Brown has presented one meritorious objection to the bill of costs, although that is not at all the case on the issue of further sanctions.

This opinion turns to the issue of costs first. On that score Brown has argued (1) that the costs sought by Health Care for deposition transcripts exceed what she represents to be the

maximum transcript rate of $3.65 per page, (2) that the purported charges for court reporter attendance fees were in excess of $220 for a full day and (3) that this Court should stay the payment of costs until Brown has appealed that issue or, alternatively, that Brown be allowed to repay the costs in installments over a 12-month period. Only the first of those three contentions has any semblance of merit.

On the claimed $2.65 per page limit, Brown's mistake is that this District Court's LR 54.1 sets higher allowable rates depending on various expedited production dates ordered by counsel. For 15 of the 20 deposition transcripts ordered by Health Care, all of the requests were within the LR's allowable limits -- but the other five had been included in the bill of costs at a per-page figure of $3.90 rather than the allowable $3.65. That error calls for a $216.30 reduction, in addition to which Health Care has dropped its $508.74 claim for the videotape recording of Brown's deposition because a transcript charge had also been included for that deposition. Those adjustments have reduced the billable costs from $7,036.15 to $6,311.11.

As for Brown's second issue she is simply wrong, because Health Care has not requested any court reporter attendance fees in its bill of costs (unsurprisingly so, because Health Care had not been charged any such fees). Hence Brown's second argument is without merit and is rejected.

Finally, with Brown remaining a heavily compensated senior director-level employee at Health Care, her request for the installment payment of taxable costs is wholly unsupported -- and indeed unsupportable. Nor does this Court sees any predicate for staying the payment of costs.

In sum, costs are entered in favor of Health Care and against Brown in the sum of $6,311.11, and Brown is ordered to pay those costs now. That said, this opinion turns to the remaining issue of sanctions.

As for the issue of supplemental sanctions, the original imposition was directly attributable to Brown's repeated abuse of the discovery process even after this Court had first counseled her on the subject and had then warned her about her continued pursuit of matters irrelevant to her case. True to form, when on June 20 of this year this Court ordered Brown to respond to Health Care's supplemental request for sanctions related to the legally frivolous Motion To Amend Judgment, Brown seized instead on the opportunity to argue that she should never have been sanctioned the first time around.

None of Brown's current arguments has any force, and Health Care's request for an additional $1,609.00 in attorneys' fees is entirely reasonable and is granted. Meanwhile this Court's understanding is that Brown has not responded to Health Care's earlier itemization (sent to her by Health Care on March 4 of this year) of the first imposed sanctions. In that respect Brown is ordered to respond forthwith with any objections that she may have to Health Care's earlier request of $13,811.00, so that this Court can quantify her total liability for attorneys' fees thrust on Health Care by her sanctionable conduct.

_____
Milton I. Shadur
Senior United States District Judge

Date: August 18, 2014

- 4 -

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| **MICHELLE Y. BROWN**, pro se, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )      Case No. 11 C 5963 |
| | ) |
| **HEALTH CARE SERVICE CORPORATION** | ) |
| and **RAYMOND E. BISANZ**, individually, | ) |
| Vice-President Enterprise Resource Management -- | ) |
| Health Care Service Corporation, | ) |
| | ) |
| Defendants. | ) |

## <u>MEMORANDUM OPINION AND ORDER</u>

Michelle Brown ("Brown"), an African-American woman still employed in a responsible executive position with Health Care Service Corporation ("Health Care") after a successful 28-year career marked by four substantial promotions fostered by Raymond Bisanz ("Bisanz," a higher-ranking Health Care executive who supervised Brown during the 16-year period ending in 2008),[1] has filed a pro se action against both Health Care and Bisanz under the auspices of 42 U.S.C. § 1981 ("Section 1981") on charges of alleged race discrimination and retaliation. To be blunt, an objective review of Brown's 15-page memorandum and her bulky supporting materials in an attempted response to defendants' current motion for summary judgment reveals her submission to be a classic example of revisionist history, for it draws unreasonable inferences from the objective facts and consequent analysis that torpedo her claims entirely.

---

[1] More precisely, the fourth of those advancements -- a promotion to Senior Director in the year 2007 -- followed a job evaluation by Health Care's Resources Department that was initiated by Bisanz. In all four instances Bisanz' supervisor Denise Bujak ("Bujak"), then Senior Vice-President and Chief Financial Officer of Health Care, approved Brown's promotions.

In its more than three decades on the bench this Court has never before adopted a litigant's submission lock, stock and barrel. This time however it would be act of supererogation to be compelled to recast defendants' powerful statement of facts and legal argument in this Court's own words, for Brown's "responsive" submission is so nonresponsive in substantive terms that it would be a major waste of a scarce commodity -- judicial time -- to parse her effort to make the worse appear the better cause.

Indeed, when Brown's memorandum and the bulky 3-inch-thick paper submission that accompany it are viewed in the cold light of reality rather than from Brown's biased viewpoint, they bring to mind one common catchphrase and two aphorisms of classical origin. Those bear mention before this opinion turns to some specifics drawn from defendants' memorandum in support of their summary judgment motion -- a memorandum that is attached to this opinion for convenient consideration.

First, the common saying that "no good deed goes unpunished"[2] is an apt description of Brown's having targeted Bisanz as a claimed racist even though it was he who initiated Brown's successive steps up the corporate ladder and even though the Director of Financial Initiatives issue about which Brown complains is really a red herring (see Defendants' Mem. 3 n.1) and actually antedated Brown's 2007 promotion to Senior Director that was launched by Bisanz. Even apart from the fact that the Director of Financial Initiatives subject is barred by limitations (a matter that Brown does not even mention in her responsive memorandum, apparently hoping that it would disappear if unspoken of), Brown seems to view Bisanz as a newly-minted racist in

_____

[2] Although the quoted statement is often attributed to Oscar Wilde -- a reasonable assumption whenever any such trenchant witticism is involved -- the first in-print attribution of that aphorism is ascribed to playwright and political personage Clare Boothe Luce, a witty personage in her own right.

spite of his sponsorship of her advancement.[3]

That calls to mind the first of the two classical allusions referred to earlier, this time the plaint by Shakespeare's King Lear:

> How sharper than a serpent's tooth it is
> To have a thankless child!

That aptly describes Brown's effort to place Bisanz in the crosshairs of her employment discrimination claim. Any claim of asserted race discrimination as to the Director of Financial Initiatives position and as to the selection of an outside applicant (Brian Sullivan) to fill that position is outlawed by limitations (Defendants' Mem. 3 n.1 and 9), while Brown's more focused claim of race discrimination -- which targets the hiring of James Walsh ("Walsh") as the Vice-President of Financial Analysis in September 2007 -- was the decision of Bujak and not Bisanz (id. at 3-5).[4]

Accordingly there is no genuine issue of material fact that stands in the way of a judgment as a matter of law in Bisanz' favor. Hence his motion for summary judgment is granted, and this opinion goes on to discuss the situation as to Health Care itself.

On that score the well-known quotation from Alexander Pope's Essay on Criticism, Part II is extraordinarily applicable to Brown and her claims:

---

[3] From Brown's submission it is clear that her perspective is one that calls for some exaggerated and ill-defined sort of affirmative action -- enough to satisfy her own self-evaluation. But employment discrimination caselaw is rife with reminders that judges do not sit as super-personnel officers -- as second-guessers of business decisions by employers -- rather than limiting themselves to dealing with statutorily prohibited conduct.

[4] As for Brown's retaliation claim, there is no question that Bisanz is not a proper target because "Bisanz played no role in the decision to transfer unclaimed property; that decision was made by Smith" (Defendants' Mem. 15).

> All seems infected that th' infected spy,
> As all looks yellow to the jaundic'd eye.

That mindset on Brown's part, which leads her to charge Health Care with a plot to create a "whites-only" Vice President position for Walsh and thereby deprive Brown of the opportunity for still another promotion, exists only in Brown's "jaundic'd eye" -- just look at Walsh's impressive credentials discussed at Defendants' Mem. 3 and 11-12 and at the steep hill that someone in Brown's position must therefore climb as described in <u>Millbrook v. IBP, Inc.</u>, 280 F. 3d 1169, 1180 (7th Cir. 2002, cited and quoted at Defendants' Mem. 8).[5]

So Brown's claim of a race-discriminatory failure to promote her comes up empty. And as for her claim of retaliation, Defendants' Mem. 14-15 knocks it down point by point to demonstrate its lack of substantive merit. Although Brown's reports of her resort to professional counseling in early 2009 and of the fact that she went on medical leave due to emotional distress and depression after filing her charge with EEOC (Plaintiff's Mem. at 4) are truly regrettable, Health Care cannot be held responsible for those consequences of what has obviously become an obsession on Brown's part -- an obsession manifested by her turgid submissions and her contentiousness at every step of this litigation. So Brown's last attempted opposition to an adverse summary judgment determination fails as well.

## <u>Conclusion</u>

There is no genuine issue of material fact through which Brown can stave off an unfavorable summary judgment. Accordingly defendants are entitled to a judgment as a matter

---

[5] Nor is <u>Millbrook</u> unique in Seventh Circuit jurisprudence -- see also the several other Seventh Circuit cases cited at Defendants' Mem. 8.

of  law, and this action is dismissed with prejudice.

_____

Milton I. Shadur
Senior United States District Judge

Date:  May 6, 2014

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **MICHELLE Y. BROWN,** *Pro Se*, | |
| Plaintiff, | |
| | No. 11-CV-5963 |
| v. | |
| | Judge Milton I. Shadur |
| **HEALTH CARE SERVICE** **CORPORATION and RAYMOND E.** **BISANZ, Individually, Vice-President** **Enterprise Resource Management -** **Health Care Service Corporation,** | Magistrate Judge Arlander Keys |
| Defendants. | |

**DEFENDANTS' LEGAL MEMORANDUM IN SUPPORT OF THEIR**
**MOTION FOR SUMMARY JUDGMENT**

I.      **INTRODUCTION**

Pro se Plaintiff Michelle Brown ("Plaintiff") does not claim that she was terminated from

Health Care Service Corporation, a Mutual Legal Reserve Company ("HCSC"); she cannot make

that claim.  She also does not claim that she was disciplined or demoted; neither of those events

have taken place.  Rather, she remains a highly-compensated, senior director-level employee that

has alleged two limited claims of race discrimination under 42 U.S.C. § 1981: one based on

promotion(s) to which she claims to have been entitled; and the other based on retaliation.

As demonstrated in detail below, this case is an unusual situation where an employee has

obtained a great deal of advancement in her 28-year career (both income-wise and position-wise)

within a large and complex organization, but is convinced in her own mind that whatever

professional advancements accorded and compensation paid to her by HCSC, they have not been

enough.  And, without any evidence that would so indicate, Plaintiff falsely and inaccurately

claims that she has been the victim of intentional race discrimination.

1

As further demonstrated below, individually-named Defendant Raymond Bisanz ("Bisanz") did not discriminate against Plaintiff, or even make the employment decisions at issue in her lawsuit. In fact, as noted below, Bisanz was responsible for promoting Plaintiff several times in the course of his supervision of her work. Although he and Plaintiff obviously share a long professional history and she is trying hard to make this case about him, he was not involved in any of the decisions within the statute of limitations on which Plaintiff bases her claims.

The parties have completed discovery regarding these claims. Based on the record evidence, it is clear that Plaintiff has failed to create a genuine issue of material fact in support of her claims. Simply put, Plaintiff's claims are entirely lacking in merit. For the reasons set forth below, Defendants respectfully requests that this Court grant their Motion for Summary Judgment, dismiss Plaintiff's Complaint in its entirety and with prejudice, and grant Defendants any further relief deemed necessary and appropriate by the Court.

## II. SUMMARY OF UNDISPUTED MATERIAL FACTS

### A. Defendants in General

Headquartered in Chicago, HCSC is the largest customer-owned health insurer in the United States and fourth largest overall. (SOF at ¶ 6). Bisanz (White), a long-time HCSC employee, has worked with the Company since 1978, over 34 years. (SOF ¶ 7). His current title is Vice President of Enterprise Resource Management. (Id.). He does not currently supervise Plaintiff. (Id.). He supervised her for the 16 year period from 1992 to 2008. (Id.).

### B. Bisanz Promoted Plaintiff Several Times and Denise Bujak Approved

In 1986, HCSC hired Plaintiff as a Junior Staff Accountant within the HCSC Finance Division. (SOF ¶ 9). In 1992, Bisanz promoted Plaintiff to the Supervisor of Financial Reporting position. (SOF ¶ 11). In 1997, Bisanz promoted Plaintiff to Manager of Financial Reporting. (SOF ¶ 12). In 2003, Bisanz promoted Plaintiff to Director of Financial Reporting.

2

(SOF ¶ 13). In June of 2007, Plaintiff was upgraded/promoted to Senior Director in 2007 after a job evaluation by HCSC's Human Resources Department, which was initiated by Bisanz. (SOF ¶ 19).[1] Bisanz's supervisor, Denise Bujak ("Bujak") (White), then-Senior Vice President and Chief Financial Officer of HCSC, approved these various promotions. (SOF ¶¶ 8, 21).

### C. James Walsh was More Qualified than Plaintiff for the Vice President of Financial Analysis Position

For much of this time, James Walsh ("Walsh") (White) was an Equity Partner at Ernst & Young ("E&Y"), one of the "Big 4" major public accounting firms. (SOF ¶¶ 22, 30). He had started at E&Y as a Principal in 2002 and was promoted to an Equity Partner in 2004. (Id.). E&Y was the principal outside auditor for HCSC, and Walsh had over ten years' experience working as the HCSC relationship partner on the annual auditing of HCSC's financial statements. (Id.). Walsh's main focus at E&Y was doing audits of insurance companies. (SOF ¶ 31). He also knew a lot about HCSC and its processes, since, as its auditor, he would have reviewed not just the financial area, but other operating areas as well. Walsh also had experience in M&A, having performed due diligence from an outside auditor's perspective. (Id.).

Prior to working for E&Y, Walsh worked at the Arthur Andersen public accounting firm, progressing through various positions, sequentially, as a Staff Auditor, Experienced Auditor, Audit Manager, Experienced Audit Manager, and then a Senior Manager at the firm. (SOF ¶ 24). Walsh is a Certified Public Accountant. (SOF ¶ 31).

In approximately May of 2007, Walsh began talking to Bujak about the possibility of

---

[1] In the summer of 2006, there was an opening for a position called the Director of Financial Initiatives ("DFI"). (SOF ¶ 14). Plaintiff pursued the job initially, which would not have been a promotion, it would have had the same job grade as her position at the time (Grade 36), it would have reported to the position held by Plaintiff at the time, and it would have had no direct reports. (SOF ¶¶ 14, 17). An outside applicant, Brian Sullivan ("Sullivan"), pursued the job and was selected in June of 2006. (SOF ¶ 18). He left after a short period of time and the job was not filled for some time. (Id.). As discussed below, all of these events preceded the relevant statute of limitations period.

pursuing professional opportunities outside E&Y. (SOF ¶ 25). Bujak was in charge of HCSC's Finance Division at the time. (Id.). Bujak and Walsh ultimately discussed the possibility of Walsh working directly for HCSC. (Id.).

Shortly thereafter, Bujak created a position, Vice President of Corporate Financial Analysis, with drafting assistance from Bisanz. (SOF ¶ 26). The job description contained pieces of the DFI position, but this was a corporate M&A job, not limited to duties just within the Finance area. (Id.). The Vice President of Corporate Financial Analysis position was created at an organizational job grade of 41, which is 4 professional job grades above the job grade 37 position that Plaintiff was promoted into by Bisanz in June of 2007. (SOF ¶ 27).

On her own initiative, Bujak met with Plaintiff in August of 2007 and told her that she was hiring Walsh as the Vice President of Corporate Financial Analysis. (SOF ¶ 28). Plaintiff did not complain about Walsh's hire. (SOF ¶ 29).

Bujak hired Walsh into the Vice President of Corporate Financial Analysis position on September 4, 2007. (SOF ¶ 30). Bujak, who was the decision-maker for creating the position and hiring Walsh, considered him to be qualified for the position. (Id.). He was coming out of a public accounting background, had M&A experience, had more than 18 years of public accounting experience in the insurance industry, and had experience in overseeing HCSC's annual financial audit and making live presentations to HCSC's higher level management team, HCSC Board committees and the HCSC Board itself. (Id.). Walsh turned down two competing offers with well-known companies in high profile roles at that time in order to take the Vice President of Corporate Financial Analysis position at HCSC. (Id.).

Bujak herself considered Plaintiff as not qualified for this Vice President of Corporate Financial Analysis position for a variety of reasons, including her lack of M&A and valuation

experience, her deficiencies in collaborating with other people in the company, and her weaker documentation and report writing skills. (SOF ¶ 31). Plaintiff also lacked Walsh's experience in making presentations to the HCSC Board and interfacing directly with HCSC senior management. (Id.).

Walsh was successful in the Vice President of Corporate Financial Analysis position and in that role, among other things, assumed the executive lead role for acquiring important wholly-owned subsidiaries. (SOF ¶¶ 38, 39).

### D. Organizational Changes in June of 2008

Bujak announced organizational changes within her Financial and Administrative organization on September 12, 2008, which were effective immediately. (SOF ¶ 41). As a part of the reorganization, Walsh became the Vice President – Chief Accounting Officer. (Id.) Additionally, as a part of the September 2008 reorganization, Bujak promoted Maurice Smith ("Smith") (Black) from Senior Director (the same level as Plaintiff) to Vice President, HCSC Reporting. (SOF ¶¶ 21, 42). The reorganization announcement in September of 2008 also included Bisanz becoming the Vice President of Enterprise Resource Management. (SOF ¶ 46). Plaintiff began to report to Smith, and she no longer reported to Bisanz. (SOF ¶ 47).

### E. HCSC Management Had Discussions Regarding the Reassignment of Unclaimed Property Months Before Plaintiff Filed Her Charge

Beginning in the fall of 2008 – at least several months before Plaintiff filed her March 2, 2009 EEOC charge – Bujak asked for a review of how Plaintiff and her team were managing their responsibility for a project known as "unclaimed property". (SOF ¶ 53). Unclaimed property was one of Plaintiff's then-assigned duties that involved managerial oversight for the screening and disbursement of monies held by HCSC as an insurance company that needed to be returned to various states under their respective escheatment laws. (Id.).

Bujak was concerned about how unclaimed property was managed because at the time, HCSC was involved in a cost-cutting cycle, and Plaintiff was relying heavily on an outside consultant to handle the work instead of utilizing less costly internal resources. (SOF ¶ 54). Despite repeated requests on the part of her senior management, Plaintiff was doing very little to develop a plan to wean her department away from using an outside consultant. (Id.).

Shortly after taking on his new role as Vice President – HCSC Reporting in 2008 and pursuant to Denise Bujak's executive direction, Smith started down the path of making the decision to reassign responsibilities for the oversight of the unclaimed property project. (SOF ¶ 55). Smith ultimately made the decision to reassign unclaimed property from Financial Reporting to Financial Operations for two reasons: (1) he was getting budgetary pressure to reduce some of the consultant expense in his area; and (2) he was concerned that the unclaimed property work was not getting done. (Id.).

The unclaimed property project was gradually moved from Plaintiff to Michael Cervenka ("Cervenka") (White), the Vice President of Financial Operations, in 2009. (SOF ¶ 56). After the unclaimed property project was reassigned to Financial Operations, Karen Nunn ("Nunn") (Black) and Karen Little ("Little") (Black) oversaw this responsibility under Cervenka's direction. (SOF ¶ 57). (Id.). Plaintiff's job title, job grade, salary, and benefits were not impacted by the movement of management responsibilities for the unclaimed property project from Plaintiff to Cervenka. (SOF ¶ 58).

## ARGUMENT

## I. LEGAL STANDARD

### A. Summary Judgment Standard

The summary judgment procedure provided for in Federal Rule of Civil Procedure 56(c) "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the

Federal Rules." <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 327 (1986). "In determining whether a genuine issue of material fact exists, courts must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party." <u>Debs v. Northeastern Ill. Univ.</u>, 153 F.3d 390, 394 (7th Cir. 1998). Substantive law determines which facts are "material;" that is, those facts which might affect the outcome of the suit under the governing law. <u>See</u> <u>McGinn v. Burlington N. R.R. Co.</u>, 102 F.3d 295, 298 (7th Cir. 1996). Consequently, a dispute over irrelevant or unnecessary facts does not preclude summary judgment. <u>See</u> <u>Hardin v. S.C. Johnson & Son, Inc.</u>, 167 F.3d 340, 344 (7th Cir. 1999).

**B.      Section 1981 Standards of Proof for Race Discrimination**

Under Section 1981, a plaintiff may apply either a direct or indirect method of proving discrimination. <u>Andrews v. CBOCS West, Inc.</u>, No. 12-3399, 2014 U.S. App. LEXIS 2842, *8 – 9 (7th Cir. Feb. 14, 2014); <u>see</u> <u>also</u> <u>Turner v. Swissport Cargo Serv.</u>, No. 05 C 4203, 2006 U.S. Dist. LEXIS 89867, at *10 (N.D. Ill. Dec. 12, 2006).[2]  The direct method typically involves some type of admission by the decision-maker or other circumstantial evidence from the defendant. <u>Turner</u>, 2006 U.S. Dist. LEXIS, at *10. A plaintiff can prevail under the direct method of proof by constructing a "convincing mosaic" of circumstantial evidence that "allows a jury to infer intentional discrimination by the decision maker." <u>Rhodes v. Ill. Dep't of Transp.</u>, 359 F.3d 498, 504 (7th Cir. 2004). Under the direct method, however, that circumstantial evidence "must point directly to a discriminatory reason for the employer's actions." <u>Id</u>.

Under the indirect method, a plaintiff must show: (1) that she is a member of a protected class; (2) she applied for an available position for which she was qualified; (3) she was rejected for the position; and (4) another similarly situated individual, not a member of her protected

---

[2] All unpublished citations are attached as Exhibit 1.

class, was hired. <u>Onafuye v. JP Morgan Chase</u>, No. 09 C 5100, 2012 U.S. Dist. LEXIS 14338, at

*17 (N.D. Ill. Feb. 7, 2012). If a plaintiff can establish a <u>prima</u> <u>facie</u> case, the burden shifts to

the employer to articulate a legitimate, nondiscriminatory reason for its actions. <u>Rhodes</u>, 359

F.3d at 504. Once the employer meets its burden, the burden shifts back to the plaintiff to

demonstrate that the employer's proffered reason is pretextual (*i.e.*, "a deliberate falsehood or

phony"). <u>Forrester v. Rauland-Borg Corp.</u>, 453 F.3d 416, 417-19 (7th Cir. 2006).

  The Seventh Circuit has weighed in several times on the standard to be applied in denial

of promotion cases such as this and has held:

> Where an employer's proffered non-discriminatory reason for its employment decision is that it selected the most qualified candidate, evidence of the applicants' competing qualifications does not constitute evidence of pretext "<u>unless those differences are so favorable to the plaintiff that there can be no dispute among reasonable persons of impartial judgment that the plaintiff was clearly better qualified</u> for the position at issue." In other words, "in effect, the plaintiff's credentials would have to be <u>so superior to the credentials of the person selected for the job</u> that 'no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question.'"

<u>Millbrook v. IBP</u>, 280 F.3d 1169, 1180 (7th Cir. 2002) (emphasis added) (quoting <u>Deines v.</u>

<u>Texas Dept. of Protective and Regulatory Services</u>, 164 F.3d 277, 280 - 281 (5th Cir. 1999); <u>see</u>

<u>also</u> <u>Dupree v. Lahood</u>, No. 10-1499, 2012 U.S. App. LEXIS 16709, at *762 (7th Cir. Aug. 10,

2012) (affirming defendant's grant of summary judgment where plaintiff was not "clearly better

qualified" than the successful candidate); <u>Tai v. Shinseki</u>, No. 08-2538, 2009 U.S. App. LEXIS

9756 (7th Cir. May 5, 2009) (same); <u>Currie v. Paper Converting Machine Co., Inc.</u>, No. 06-

2419, 2006 U.S. App. LEXIS 25510, *122 (7th Cir. Sept. 27, 2006) (plaintiff failed to show that

he was "unquestionably better qualified" than the other eight candidates).

## II.     PLAINTIFF'S CLAIMS OF RACE DISCRIMINATION FAIL

Plaintiff's Second Amended Complaint focuses on two events of alleged race discrimination: (1) the hiring of Sullivan as the Director of Financial Initiatives in June of 2006; and (2) the hiring of Walsh as the Vice President of Financial Analysis in September of 2007. As demonstrated below, the first of these two events is barred by the relevant statute of limitations, as it pre-dates August 26, 2007. Even if Plaintiff's reliance on this first event was timely, which it is not, Plaintiff's cannot defeat the instant motion under either the direct or indirect methods of proof. The second event -- her denial-of-promotion claim based on the hiring of Walsh as the Vice President of Corporate Financial Analysis in September of 2007 -- narrowly falls within the relevant statute of limitations; however, it is likewise without merit.

### A.     Plaintiff's Promotion Claim Regarding the DFI Position is Barred By The Statement of Limitations

Under Section 1981, a plaintiff must bring a claim within four years of the alleged discrimination. Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 382-83 (2004). Because Plaintiff filed her original Complaint on August 26, 2011, her actionable Section 1981 claims are limited to the alleged discriminatory or retaliatory conduct occurring between August 26, 2007 and August 26, 2011, which are the four years prior to the filing of her Complaint. (SOF ¶ 3, fn. 2). Despite this clear limitation, Plaintiff claims that she was discriminated against based on her race with respect to the hiring of Sullivan for the DFI position in June of 2006 – three months beyond the statute of limitations period. (SOF ¶¶ 1, 9 - 13). Consequently, Plaintiff's claim of race discrimination with respect to this "promotion" is untimely. Jones, 541 U.S. at 382-83; Rainey v. UPS, No. 10 C 4669, 2013 U.S. Dist. LEXIS 40369, at *12 (N.D. Ill. Mar. 21, 2013); Fischer v. Caterpillar, Inc., No. 11 C 1665, 2012 U.S. Dist. LEXIS 33236, at *4 – 7 (N.D. Ill. Mar. 13, 2012).

### B.  Even If Plaintiff's DFI Claim Was Timely, It Fails On The Merits

Even if Plaintiff's DFI claim was timely, which it is not, it fails under the direct and indirect methods of proof. As an initial matter, Plaintiff has provided no direct evidence of race discrimination. (SOF ¶ 67). Thus, she cannot prevail under the direct method of proof. See Montgomery v. Am. Airlines, Inc., 626 F.3d 382, 393 (7th Cir. 2010); Coffman v. Indianapolis Fire Dep't, 578 F.3d 559, 563 (7th Cir. 2009). Additionally, Plaintiff cannot prevail under the indirect method of proof. Indeed, Plaintiff suffered no adverse action because the DFI position would have been a lateral move, and Bisanz believed that Plaintiff's existing role was much more valuable to the Department and HCSC, than if she stepped in to the role to fill the DFI position. (SOF ¶¶ 14, 17). See Porter v. City of Chicago, 700 F.3d 944, 954 (7th Cir. 2012) (explaining that a "materially adverse change might be indicated by a . . . *demotion evidenced by . . . significantly diminished material responsibilities*) (emphasis added); see also Oest v. Ill. Dep't of Corrs., 240 F.3d 605, 612 – 613 (7th Cir. 2001) (same). Further, Plaintiff cannot establish that HCSC's legitimate, nondiscriminatory reason for not hiring her for the DFI position (Sullivan was the better candidate) was pretexual. (SOF ¶¶ 17, 18). This is a legitimate, nondiscriminatory reason. Accordingly, Plaintiff cannot establish her claim of race discrimination with respect to the DFI position. Therefore, Defendants should be granted summary judgment with respect to this claim.

### C.  Plaintiff's Promotion Claim Regarding the Vice President of Financial Analysis Position Is Likewise Without Merit

Plaintiff's second denial-of-promotion claim is based on the hiring of Walsh as the Vice President of Financial Analysis in September of 2007. (SOF ¶ 3). Again, Plaintiff has no direct evidence of race discrimination and, therefore, must use the indirect method of proof. She fails in this endeavor as well. Montgomery, 626 F.3d at 393; Coffman, 578 F.3d at 563.

Plaintiff cannot show that she was "clearly better qualified" than Walsh or that her credentials were "so superior to the credentials" of Walsh that "no reasonable person, in the exercise of impartial judgment," could have chosen Walsh over her for the Vice President of Corporate Financial Analysis position. Millbrook, 280 F.3d at 1180; see also Dupree, 2012 U.S. App. LEXIS 16709, at *762; Currie, 2006 U.S. App. LEXIS 25510, at *122.

As an initial matter, Plaintiff testified that she does not have an opinion on whether Walsh was *qualified* to be a Vice President level employee in the Finance Division of HCSC. (SOF ¶ 35). Plaintiff also testified that she is *not* in a position to answer whether *she* was *more qualified* than Walsh for the Vice President of Corporate Financial Analysis position. (SOF ¶ 36). These admissions demonstrate that Plaintiff cannot show that she was "clearly better qualified" than Walsh or that her credentials were "so superior" compared to Walsh. Millbrook, 280 F.3d at 1180; see also Dupree, 2012 U.S. App. LEXIS 16709, at *762; Currie, 2006 U.S. App. LEXIS 25510, at *122. For this reason alone, Plaintiff's race discrimination claim with respect to the Vice President of Corporate Financial Analysis position fails.

In addition to Plaintiff's express admissions, her claim of race discrimination in this respect fails because Walsh was a highly qualified candidate for the grade 41 officer-level position into which he was hired in September of 2007. Bujak, who was the decision-maker for creating the position and hiring Walsh, considered him to be qualified for the position for several reasons. (SOF ¶ 30). He was coming out of public accounting, had M&A experience, had more than 18 years of public accounting experience in the insurance industry, and had experience in overseeing HCSC's annual financial audit and making live presentations to HCSC's higher level management team, HCSC Board committees and the HCSC Board itself. (Id.). Further demonstrating his qualifications, Walsh turned down two competing offers with well-known

companies in high profile roles at that time in order to take the Vice President of Corporate Financial Analysis position at HCSC. (Id.). Moreover, Walsh's continued success at HCSC since his hire reinforces his qualifications and abilities for stepping into the Vice President of Corporate Financial Analysis position in the first place. (SOF ¶¶ 41, 52).[3]

Moreover, Bujak herself did not believe that Plaintiff was qualified for this Vice President of Corporate Financial Analysis position for a variety of reasons, including her lack of M&A and valuation experience, her deficiencies in collaborating with other people in the company, and her weaker documentation and report writing skills. (SOF ¶ 31). Plaintiff also lacked Walsh's experience in making presentations to the HCSC Board and interfacing directly with HCSC senior management. (Id.).

Thus, Plaintiff cannot establish that HCSC's legitimate, nondiscriminatory reason for selecting Walsh over Plaintiff (Walsh was more qualified) was pretextual. (SOF ¶¶ 23 - 24). This is a legitimate, nondiscriminatory reason, and it is well established that a court's role is not to act as a "super personnel department" that second-guesses employer's business judgments. Millbrook, 280 F.3d at 1180 – 1181. While Plaintiff disagrees with HCSC's position regarding her qualifications, the fact remains that her contentions that she is the better candidate for this position constitutes nothing but the Plaintiff's own opinion, which is insufficient to defeat summary judgment. Id. at 1181.

Furthermore, Bujak approved Plaintiff's various promotions and made the decision to promote Smith, an African American. This alone belies Plaintiff's assertions that Bujak allegedly held discriminatory animus towards African American professionals.

---

[3] As Plaintiff was not qualified for the Vice President of Corporate Financial Analysis position, she cannot claim that she should have or could have received the promotions that Walsh subsequently received into the Vice President – Chief Accounting Officer and then Divisional Senior Vice President, Chief Accounting Officer positions.

Lastly, as previously stated supra, p. 11, Bujak was the decision-maker for hiring Walsh into the Vice President of Corporate Financial Analysis position. (SOF ¶ 30). Bisanz played no role in the decision to hire Walsh. (SOF ¶ 33). Thus, Plaintiff cannot demonstrate that Bisanz discriminated against her with respect to the hiring of Walsh into this position.

Accordingly, Plaintiff cannot establish her claims of race discrimination with respect to the Vice President of Financial Analysis position. Therefore, Defendants should be granted summary judgment with respect to these claims.

## III. PLAINTIFF'S RETALIATION CLAIM FAILS

### A. Retaliation Standard

A plaintiff may establish a retaliation claim under either the direct or indirect method of proof. Stephens v. Erickson, 59 F.3d 779, 786 (7th Cir. 2009). Under the direct method, a plaintiff must demonstrate that (1) she engaged in a statutorily protected activity; (2) she suffered a materially adverse action; and (3) a causal connection exists between the two. Id..

Under the indirect method, the first two elements remain the same, but instead of providing a direct causal link, a plaintiff must show that she was performing her job satisfactorily and that she was treated less favorably than a similarly situated employee who did not complain of discrimination. Id. at 786-87. If a plaintiff is able to establish a prima facie case under the indirect method, then the defendant must articulate a legitimate, nondiscriminatory reason for its actions. Id. at 787. The plaintiff must then demonstrate that the defendant's reason is pretexual. If the plaintiff is unable to present a prima facie case, however, there is no need to discuss the defendant's legitimate, nondiscriminatory reason for its decision or pretext. See Keeton v. Morningstar, Inc., 667 F.3d 877, 885 – 886 (7th Cir. 2012).

### B. Plaintiff's Retaliation Claims Are Without Merit

Plaintiff claims that she was retaliated against by Defendants after filing her March 2,

13

2009 EEOC charge. (SOF ¶ 3). As for the alleged retaliatory act, Plaintiff pointed to the reassignment of "unclaimed property" from her to Financial Operations. (Id.). However, this is not sufficiently adverse to be actionable, and Plaintiff has produced no evidence that such action by her management was motivated by any racial or other improper consideration. It is well established in the Seventh Circuit that for a transfer or reassignment of job duties to be considered an adverse action it must represent a "*significant* alteration to the employee's duties, which is often reflected by a corresponding change in work hours, compensation, or career prospects." Stephens v. Erickson, 569 F.3d 779, 786 (7th Cir. 2009) (emphasis in the original).[4] Here, Plaintiff's job title, job grade, salary, and benefits were not impacted by the movement of management responsibilities for the unclaimed property project. (SOF ¶ 58). In fact, Plaintiff continued to earn the same pay with one less responsibility on her plate. (SOF ¶ 55). Clearly, the reassignment of this work was not an "adverse action."

Additionally, Plaintiff cannot show that there is a causal connection between her March 2, 2009 EEOC Charge and the removal of the unclaimed property responsibilities. Indeed, consistent with HCSC cost-cutting cycle in the annual budget development process leading up to 2009, there were ongoing discussions by HCSC management in the fall of 2008 – 4-6 months before Plaintiff filed her Charge – about the possibility of reassigning unclaimed property elsewhere in HCSC's Finance Division, which ultimately occurred in 2009. (SOF ¶¶ 55 - 57).

---

[4] Plaintiff also claims that she did not receive certain email communications, Smith was slow to respond to her emails and close her performance appraisal, and that Cervenka followed her out of Walsh's office following a discussion regarding the removal of unclaimed property, but Plaintiff admits that she has no direct evidence to support that these alleged acts were retaliatory. (SOF ¶ 63). Additionally, these alleged acts do not meet the standard of being an adverse action. (See Fane v. Locke Reynolds, LLP, 480 F.3d 534, 539 (7th Cir. 2007); Dennis v. Potter, 2012 U.S. Dist. LEXIS 40034 (N.D. Ind. Mar. 23, 2012); Carroll v. Merrill Lynch, 2011 U.S. Dist. LEXIS 51311 (N.D. Ill. May 13, 2011); Palermo v. Clinton, 2011 U.S. Dist. LEXIS 35238 (N.D. Ill. Mar. 31, 2011); Bowden v. Kirkland & Ellis, LLP, 2010 U.S. Dist. LEXIS 91730 (N.D. Ill. Sept. 2, 2010). Further, Plaintiff cannot demonstrate that she was treated differently than an employee that did not file a charge. (SOF ¶ 63). Stephens, 59 F.3d 786.

Thus, Plaintiff cannot argue that the reassignment of unclaimed property was in retaliation for her filing a Charge. <u>Dillard v. Chi. Transit Auth.</u>, No. 03-3538, 2004 U.S. App. LEXIS 14640, at *111 (7th Cir. July 14, 2004).

Further, Plaintiff cannot claim that she was performing her job satisfactorily. Indeed, HCSC management removed unclaimed property from Plaintiff's purview because they were not satisfied with her management of this work. (SOF ¶ 55). <u>Stephens</u>, 59 F.3d 786.

Moreover, Plaintiff cannot claim that she was treated less favorably than a similarly situated employee because she cannot and has not pointed to a single HCSC employee that oversaw unclaimed property during a cost-cutting cycle and had these responsibilities removed because the work was not getting done. (<u>Id</u>.).

Lastly, Bisanz played no role in the decision to transfer unclaimed property; that decision was made by Smith. (SOF ¶ 55). Thus, Plaintiff cannot claim that Bisanz retaliated against her. Therefore, Plaintiff's retaliation claims against Defendants fail as a matter of law.

## IV.  CONCLUSION

WHEREFORE, Defendants respectfully request that the Court grant their Motion for Summary Judgment, dismiss Plaintiff's Second Amended Complaint in its entirety and with prejudice, and grant Defendants any further relief deemed necessary and appropriate.

Respectfully submitted,

*/s/ Michael A. Wilder*

Michael A. Wilder ARDC# 6291053

Dana S. Connell ARDC#6183652
Michael A. Wilder ARDC# 6291053
LITTLER MENDELSON, P.C.
321 N. Clark St, Suite 1000,
Chicago, IL  60654, 312.372.5520
Dated: March 3, 2014

15

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **MICHELLE Y. BROWN**, pro se, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 11 C 5963 |
| | ) | |
| **HEALTH CARE SERVICE CORPORATION** | ) | |
| and **RAYMOND E. BISANZ**, individually, | ) | |
| Vice-President Enterprise Resource Management -- | ) | |
| Health Care Service Corporation, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM ORDER

After a comprehensive review of the parties' detailed submissions in this employment discrimination case brought by pro se plaintiff Michelle Brown ("Brown"), this Court issued a May 6, 2014 memorandum opinion and order ("Opinion") that granted defendants' bitterly contested motion for summary judgment and dismissed this action. As might have been anticipated, Brown -- continuing her emulation of the Energizer Bunny, who is portrayed in television commercials as continuing to keep running and running (and is still running) -- has filed what she labels "Plaintiff's Motion To Amend Judgment," but what is really a turgid rehash of her prolix and unsuccessful opposition to that summary judgment motion. Brown's current filing comprises a closely-packed 15-page motion[1] coupled with a half-inch-thick set of exhibits

_____

[1] This District Court's LR 5.2(c) requires all filings to be in 12 point type, with footnotes at least in 11 point type, with the line spacing to be at least 2.0 lines and with 1-inch margins at the top, bottom and each side of the 8-1/2" x 11" sheets. This Court has never paid much attention to those requirements because it so rarely (if ever) denies motions for the filing of oversized memoranda, but an eyeballing of Brown's current filing leaves a strong impression that she has disregarded several of those requirements. And to what end?

(much of it in even smaller type).  Reading that submission reveals its real nature as a motion for

reconsideration, as to which the three-decade-old classic description by the late District Judge

Dortch Warriner in <u>Above the Belt, Inc. v. Mel Bohannan Roofing, Inc.</u>, 99 F.R.D. 99, 101

(E.D. Va. 1983) has been referred to and quoted in relevant part by many courts (including our

own Court of Appeals). Here is Judge Warriner's sage teaching:

> Plaintiff has also misused the pleading plaintiff has called a motion for
> reconsideration.  Though there is no such motion mentioned in the Federal Rules
> of Civil Procedure, the motion is not uncommon in federal practice.
> Reconsideration, as generally used is a reconsideration by the same court by
> which the original determination was made.
>
> *       *       *
>
> It is clear, then, that there are circumstances when a motion to reconsider may
> perform a valuable function.  In this case no function at all, other than reiteration,
> was served by the motion.
>
> *       *       *
>
> The motion to reconsider would be appropriate where, for example, the Court has
> patently misunderstood a party, or has made a decision outside the adversarial
> issue presented to the Court by the parties, or has made an error not of reasoning
> but of apprehension.  A further basis for a motion to reconsider would be a
> controlling or significant change in the law or facts since the submission of the
> issue to the Court.  Such problems rarely arise and the motion to reconsider
> should be equally rare.

That universally applied standard is one that Brown has clearly failed to satisfy.  Instead

her current filing plainly demonstrates two things:

1.      If <u>Brown</u> had been the decisionmaker as to the promotions of which she

        claims to have been deprived, she would no doubt have obtained them.

2.    But she was not.[2]  Instead what this Court said in the Opinion, in which it

found what it called "defendants' powerful statement of facts and legal

argument" so compelling that for the first time in its more than three

decades on the bench it "adopted a litigant's submission lock, stock and

barrel," still controls.

That's it.  Brown's motion is denied.  Although neither side is required to attend court at

Brown's designated June 13 presentment date to address her motion, they are ordered to appear

at that time to discuss Brown's liability (1) for sanctions, both those previously ruled upon and

also any possible further sanctions attributable to her more recent conduct, and (2) for

defendants' recently filed bill of costs.

_____

Milton I. Shadur
Senior United States District Judge

Date:  June 4, 2014

_____

[2]  As Publilius Syrus said in his Maxim 545 more than two millennia ago:

No one should be judge in his own cause.

- 3 -